1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10  KIMBERLY KENNEDY,                    CASE NO. 13cv1632-WQH(KSC)

11                        Plaintiff,     **REPORT AND RECOMMENDATION
                                         DENYING PLAINTIFF'S MOTION**
12      vs.                              **FOR SUMMARY JUDGMENT AND
                                         GRANTING DEFENDANT'S CROSS**
13                                       **MOTION FOR SUMMARY**
    CAROLYN W. COLVIN, *acting*          **JUDGMENT**
14  *Commissioner of Social Security*,
                                         [Doc. Nos. 16, 23]
15                        Defendant.

16

17          Pursuant to Title 42, United States Code, Section 405(g) of the Social Security

18  Act ("SSA"), plaintiff Kimberly Kennedy ("plaintiff") filed a Complaint on July 12,

19  2013 to obtain judicial review of a final decision by the Commissioner of Social

20  Security ("defendant") denying her claim for a period of disability, disability insurance

21  benefits ("DIB"), and supplemental security income ("SSI").[1] This case was referred

22  for a Report and Recommendation on the parties' Motions for Summary Judgment.

23  [Doc. No. 4; *See* 28 U.S.C. § 636(b)(1)(B)] After considering the moving papers [Doc.

24  _____

25      [1]    Title 42, United States Code, Section 405(g), provides as follows: "Any
    individual, after any final decision of the Commissioner of Social Security made after
26  a hearing to which he was a party ... may obtain a review of such decision by a civil
    action ... brought in the district court of the United States.... The court shall have power
27  to enter, upon the pleadings and transcript of the record, a judgment affirming,
    modifying or reversing the decision of the Commissioner of Social Security, with or
28  without remanding the cause for a rehearing. The findings of the Commissioner ... as
    to any fact, if supported by substantial evidence, shall be conclusive."

Nos. 16, 23, 24 (Duplicate), 26], the Administrative Record [Doc. No. 10], and the applicable law, the Court **RECOMMENDS** that plaintiff's Motion for Summary Judgment [Doc. No. 16] be **DENIED**, and that defendant's Cross Motion for Summary Judgment [Doc. No. 23] be **GRANTED**.

## I. PROCEDURAL HISTORY

Plaintiff filed applications for a period of disability, DIB, and SSI on June 16, 2010, alleging disability beginning on November 1, 2008. [Administrative Record (AR) at 213-228] After defendant denied plaintiff's applications at both the initial and reconsideration levels [AR at 120-27, 130-36], plaintiff appeared with her attorney before Administrative Law Judge ("ALJ") Leland Spencer on April 9, 2012 in San Diego, California. [AR at 24-71] ALJ Spencer heard testimony from plaintiff, medical expert Eric C. Puestow, M.D., and vocational expert John P. Kilcher. *Id.* Based on the testimony and the documentary evidence, on April 17, 2012, the ALJ issued his written decision, finding that plaintiff was not disabled under sections 216(i) and 223(d) of the SSA. [AR at 10-18] The ALJ's finding that plaintiff was not disabled became defendant's final decision on May 17, 2013, when the Appeals Council declined plaintiff's request for review. [AR at 1-5]

## II. RELEVANT FACTS

### A. Background

Plaintiff was born on October 16, 1959. [AR at 296] She completed school up through the 11th grade and is able to communicate in English. [AR at 246-48] Plaintiff's past work experience includes the occupations of assistant deli manager, bartender, administrative clerk, and truck rental agent. [AR at 248] Her positions of assistant deli manager and bar tender required standing, walking, bending, kneeling, crawling, reaching, pushing, pulling, lifting up to 50 pounds, squatting, climbing, overhead work, and grasping. [AR 256-59] Her positions of administrative clerk and truck rental agent required both sitting and standing, walking, climbing, stooping, kneeling, crouching, grasping, pushing, pulling, and lifting between 30 and 50 pounds.

1  [AR 260-61]  Plaintiff complains of chronic back pain, gastrointestinal issues, kidney
2  disease, and bladder/bowel problems. [AR at 247]  Plaintiff claims these problems
3  caused her difficulty at work, most notably severe back pain from being on her feet at
4  her last job of bartender.  *Id.*  In an Exertional Daily Activities Questionnaire
5  completed by plaintiff on July 7, 2010, she states that she lives with a friend and that
6  her average day consists of sleeping, walking, and some chores, but that her constant
7  pain hinders all of these activities and her ability to leave the house. [AR at 253-55]
8      **B.  Medical Evidence**
9          **1.  Desert Oasis Medical Center (2007 - 2010)**
10         From 2007 to 2010, plaintiff visited Desert Oasis Medical Center numerous
11  times presenting with a myriad of symptoms and complaints, most commonly back pain
12  and gastrointestinal issues, but also including hemorrhoids and skin irritation on her
13  arms and face. [AR 459-88]  On August 24, 2007, plaintiff presented to this facility
14  for the first time complaining of anxiety, bruising to her ribs caused by a recent fall,
15  diarrhea, and a lump on the back of her left leg. [AR at 471]  She advised that she was
16  in the process of separating from her spouse.  *Id.*  Plaintiff admitted to smoking 1 and
17  ½ packs of cigarettes per day and drinking alcohol, but denied using illicit drugs.  *Id.*
18  The treating physician referred her to a surgeon for the lump, to a gynecologist for an
19  annual check-up, and prescribed Lopramide for the diarrhea.  [AR at 472]
20         On December 27, 2007, plaintiff appeared for a follow-up presenting with a mild
21  rash, sore throat, and chronic diarrhea. [AR at 469] At that point, plaintiff had still not
22  presented to a gynecologist as previously referred.  *Id.*  Plaintiff was prescribed
23  Benadryl for the rash, a Z-Pack for the sore throat, and given Loperamide for the
24  diarrhea.  *Id.*  She was again advised to schedule an appointment with a gynecologist
25  and referred to a gastroenterologist.  *Id.*
26         On July 10, 2008, plaintiff again presented with anxiety, and advised that she
27  was in the midst of divorce proceedings. [AR at 466] Plaintiff stated that Xanaz helped
28  with anxiety in the past, and wanted to try it again.  *Id.*  Additionally, she complained

1  of a generalized rash, acid reflux, and chronic diarrhea. *Id.* However, she failed to see

2  a gastroenterologist, as referred in December of 2007. *Id.* She was prescribed Xanax

3  for anxiety, Prilosec for acid reflux, and referred to Dr. Singh for the diarrhea. *Id.*

4        On March 25, 2009, plaintiff complained of anxiety and acid reflux and sought

5  refills of her Xanax and Prilosec, stating that she recently regained insurance coverage.

6  [AR at 465] Plaintiff denied any abdominal pain, diarrhea, or urinary complaints. *Id.*

7  She also sought a referral to her gynecologist, Dr. Borchers. *Id.* The prescriptions

8  were filled and the referral was made as requested. *Id.*

9        On April 16, 2009, plaintiff presented as a walk-in patient to the clinic as a

10 follow-up to a recent emergency room visit. [AR at 467] Plaintiff had been seen and

11 treated in the ER the previous day with kidney stones, hematuria, and abdominal pain.

12 *Id.* After being given three medications in the ER, she woke up the next day with an

13 itchy rash. *Id.* All three medications were discontinued, and replaced with Bactrim,

14 Atarax, and an injection to relieve the itching. *Id.* Plaintiff was referred to Dr. Azher

15 for the kidney stones. *Id.*

16       On January 22, 2010, plaintiff and "her significant other" appeared in the clinic,

17 complaining of itching on her arms and face. [AR at 463] She denied any pain in her

18 abdomen, back, or joints. *Id.* Her alcoholism and tobacco addition were identified as

19 contributing factors. [AR at 463-64] Plaintiff presented again on April 15, 2010 for a

20 follow-up. [AR at 461] Due to a fight a couple of weeks prior, bruising appeared on her

21 right breast area. *Id.* However, she denied any chest pain, abdominal pain, diarrhea,

22 or urinary complaints. *Id.* Plaintiff sought an increase in her Xanax dosage, as the

23 current amount prescribed was no longer providing relief. *Id.* Her Xanax prescription

24 was increased, and a referral made for hemorrhoids. [AR at 461-62]

25       On June 8, 2010, plaintiff presented with back pain and acid reflux, seeking

26 medication for both. [AR at 460] This came shortly after her discharge from the

27 hospital on June 4, 2010, to which she was admitted for 10 days for sepsis and anemia

28 starting on May 26, 2010. *Id.* She was advised to continue the medicines proscribed

in May, and diagnosed with alcoholic liver disease and anxiety. *Id.* She was prescribed Ultram, Soma, and Zantac for the back pain and ordered to return in one month with a completed blood test. *Id.*

On July 14, 2010, plaintiff presented complaining of a burning sensation while urinating. [AR at 485]  Bactrim was prescribed and plaintiff was again advised to get a blood test, something she failed to do following her June 8, 2010 visit. *Id.*

The Court notes that on a number of plaintiff's visits in 2010, she denies any back or abdominal pain. [AR at 461, 463, 485]

### 2. Western Arizona Regional Medical Center (2009 - 2010)

On April 14, 2009, plaintiff presented to the emergency room chiefly complaining of severe flank pain, diarrhea, nausea, and vomiting. [AR at 447] Plaintiff advised medical staff of her history of kidney stones and that she recently experienced burning with urination that had since resolved. *Id.*   A CT scan of her abdomen and pelvis revealed no acute findings. [AR at 448]  Plaintiff was diagnosed with kidney stones, but feeling much better one hour into the visit, she was discharged with instructions and a variety of prescriptions. [AR at 449] On June 10, 2009, plaintiff presented in the emergency room with sudden onset of lesions. [AR at 443] Plaintiff was diagnosed with elevated liver enzymes, and instructed not to drink alcohol or take Aspirin. *Id.*

On May 26, 2010, plaintiff was taken to the emergency room by ambulance and admitted after being found unconscious on the floor of her domicile.  [AR 330-440] Upon initial physical examination, her vital signs were normal, there was no evidence of external trauma, her heart rate and rhythm were normal, and she had normal range of motion in her extremities. [AR at 371] Upon regaining consciousness, plaintiff explained that she had been experiencing flu-like symptoms and fell and hit her head, causing her to lose consciousness. [AR at 357] Plaintiff denied any chest pain, but complained of incontinence. *Id.* CT scans were taken of her head, thoracic spine, abdomen, and pelvis, an MRI was taken of her brain, and an X-Ray taken of her chest.

1   [AR at 423-30] While some mild abnormalities were discovered, nothing acute was
2   identified in these scans. More specifically, no "acute intracranial pathology" was
3   discovered in her head scans, and "[n]o evidence of acute or active cardiopulmonary
4   disease" presented in the lungs. [AR at 440, 435] However, mild cerebral atrophy was
5   discovered in her brain, and a mildly enlarged kidney in her abdomen. [AR at 437, 432]
6   Examination of lung fields were clear and stable, showing only a pattern of bronchitis.
7   [AR at 434] She was diagnosed with septicemia and a urinary tract infection, kept
8   under close watch, and treated with a broad spectrum antibiotic. [AR at 340, 357]
9   Plaintiff was discharged on June 4, 2010, after 10 days in the hospital. [AR at 330]

10          **3. Tri-City Medical Center (2010)**

11          On December 16, 2010, plaintiff presented to the emergency department
12  complaining of a sore throat, high fever, cough, chills, ear pain, and general body
13  aching. [AR at 519-30] At the time of her admission, she was not experiencing any
14  vomiting, nausea, labored breathing, or any other alarming displays. [AR at 519]
15  Plaintiff's daughters expressed concern because of plaintiff's prior admission for sepsis
16  on May 26, 2010. [AR at 520-21] "Because [plaintiff] is immune compromised by her
17  alcoholism it is felt that she should be treated vigorously with antibiotics to make sure
18  that this does not recur...." [AR at 521] Plaintiff responded well to hydration and
19  antibiotics. *Id.* She was diagnosed with a sore throat and a urinary tract infection and
20  discharged the same day. [AR at 525]

21          On September 16, 2011, plaintiff arrived at the emergency room with a change
22  in mental status and was admitted for further evaluation. [AR at 549] Specifically,
23  plaintiff's parents brought her in because plaintiff appeared confused and sleepy. [AR
24  at 551] During intake, plaintiff reported that she was an alcoholic and that it had been
25  roughly 1 year since she had consumed alcohol, when she was hospitalized for septic
26  shock. *Id.* Plaintiff also complained of head, neck, and back pain. [AR at 560] She
27  was diagnosed with a urinary tract infection, hepatic encephalopathy, and cirrhosis of
28  liver (alcohol-induced). [AR at 549] All symptoms resolved after treatment with

13cv1632-WQH(KSC)

1    lactulose and antibiotic. *Id.* Plaintiff was discharged three days later, on September
2    19, 2011. *Id.*

3    ### 4. Michael Chipman, D.O. - Consultative Examiner (orthopedist) (2010)

4    On August 17, 2010, Dr. Chipman examined plaintiff, and reviewed her medical
5    records to date in advance of the exam, for the purpose of completing a Social Security
6    Disability Evaluation. [AR at 499-502] On the date of examination, plaintiff's chief
7    complaints were of back pain and bowel/bladder problems. [AR at 499] Plaintiff was
8    able to ambulate in the room, get on and off the table, and take her slip-on shoes on and
9    off without assistance or difficulty. [AR at 500] Dr. Chipman conducted a physical
10   exam and tested plaintiff's range of motion and muscle strength, noting that the x-ray
11   of the lumbar spine shows "minimal degenerative changes and no evidence of acute
12   pathology." [AR at 500-01] Thus, Dr. Chipman opined that plaintiff's condition would
13   not impose a limitation for 12 continuous months. [AR at 501]

14   ### 5. Doris Javine, Ph. D. - Consultative Examiner (psychchologist) (2010)

15   On August 19, 2010, Dr. Javine, a clinical psychologist, conducted a 1 hour and
16   15 minute examination of plaintiff. [AR at 503-07] Dr. Javine noted that plaintiff drove
17   to the interview, arrived on time, was appropriately dressed and with a cooperative and
18   pleasant attitude, with sores on her face and leg, and appearing older than her stated
19   age of 50 years. [AR at 503] Plaintiff asserted that she is unable to work because she
20   cannot stand for "longer than like thirty minutes without [her] kidney[]s hurting. . . .
21   [and she cannot] sit [for] longer than fifty minutes [before] they start bothering [her]."
22   *Id.* Dr. Javine noted that her speech was mildly slurred and that she appears to have
23   problems retrieving words, making her mildly difficult to understand. [AR at 504]
24   Plaintiff reported managing her own finances, knowing how to use a computer,
25   showering every other day, brushing her teeth daily, and dressing without the
26   assistance of others. *Id.* Dr. Javine subjected plaintiff to a battery of scenarios meant
27   to test the following categories: orientation, recall, memory, intelligence, calculation,
28   abstract thinking, similarities and differences, and judgment. [AR at 505-05]

1   Dr. Javine noted that while plaintiff exhibited difficulty with serial 3's, she was
2   capable of counting backwards from 20 and there were no other cognitive difficulties
3   displayed. [AR at 507] More specifically, Dr. Javine found that plaintiff had no
4   limitations in the following three areas: (1) ability to understand and remember simple
5   instructions, locations, and work-like procedures; (2) social interactions; and, (3)
6   responding appropriately to changes in the work setting or in responding to hazards.
7   [AR at 508] However, plaintiff was noted as having "mild" impairment in
8   concentration and persistence. *Id.* Dr. Javine concluded by opining that plaintiff "will
9   likely be unable to manage awarded benefits responsibly and in her best interest." [AR
10  507-08]

11  **6. Sarah Shepherd, D.O. - Consultative Examiner (orthopedist) (2010)**

12  After reviewing plaintiff's medical records to date in advance, on February 13,
13  2011, Dr. Shepherd examined plaintiff for the purpose of completing a Social Security
14  Disability Evaluation. [AR at 533-38] On the date of the examination, plaintiff
15  complained of pain in her right hip, right knee, and generalized pain "body wide." [AR
16  at 533] Plaintiff described the hip pain as constant, throbbing, aching, and only relieved
17  when she moves her right leg around. [AR at 533] She described the knee pain as being
18  triggered by her hip pain, and stated that she has fallen numerous times due to
19  unsteadiness on her right leg. *Id.* In a typical day, plaintiff is able to sleep eight to ten
20  hours a day, take her medication, straighten up her room, do stretching exercises, wash
21  dishes, do laundry, and do some grocery shopping. [AR at 534] Plaintiff reported
22  Soma, Tramadol, Xanax, and Ranitidine as her current medications, and denied
23  smoking, but admitted to alcohol use. *Id.*

24  Upon physical examination, plaintiff was pleasant and cooperative, able to sit
25  and walk comfortably and without difficulty, but smelled of alcohol. *Id.* Dr. Shepherd
26  found plaintiff to have good strength and full range of motion in her joints and
27  extremities. [AR at 535]  As a result of these findings, Dr. Shepherd found that
28  plaintiff's complaints of subjective pain in her right hip, right knee, and "body wide"

1  were all without objective clinical correlation. [AR at 536] Thus, Dr. Shepherd opined

2  that plaintiff's condition would not impose a limitation for 12 continuous months. *Id.*

3  **7. Cynthia McKinney, M.D. (2011)**

4        On April 1, 2011, plaintiff presented as a new patient to the Vista Community

5  Clinic for the purpose of establishing a plan of care for her chronic back pain and

6  abdominal pain. [AR at 603-23] Dr. McKinney received a thorough social and medical

7  history from plaintiff.  Among other items revealed during intake, plaintiff stated she

8  is a recovering alcoholic who, prior to 2010, consumed approximately 4 drinks of hard

9  alcohol per day. [AR at 604]  Plaintiff had recently moved from Arizona and sought a

10  refill of her medications. [AR at 603] A physical examination revealed normal findings,

11  including plaintiff's back which was described as "non-tender." [AR at 605]  In

12  addition, a battery of blood tests and labs was ordered.  *Id.*  Plaintiff brought certain

13  hospital records, specifically from her emergency room stay in Arizona in May of 2010,

14  when she was admitted after being found unresponsive at home and diagnosed with

15  sepsis triggered by a urinary tract infection.  Dr. McKinney instructed plaintiff that her

16  most recent medical records needed to be produced and reviewed before most of the

17  desired medications could be refilled.  *Id.*  In addition, plaintiff was advised that she

18  would be required to sign an "Initial Pain Contract Eval[uation]" before any narcotic

19  medications would be prescribed, and only after her prior records were received and

20  reviewed and the medications were deemed appropriate.  *Id.*

21        On April 13, 2011, plaintiff presented for a follow-up on the labs taken at her

22  prior visit. [AR at 600-01] The labs showed evidence of chronic alcohol abuse, which

23  was confirmed in the records received from Arizona. [AR at 600] Dr. McKinney

24  discussed scheduling a CT scan of plaintiff's liver to evaluate its function so as to

25  determine the next step for treatment of her liver disease. [AR at 601]

26        On April 27, 2011, plaintiff saw Dr. McKinney for the purpose of being

27  evaluated for pain medications.  [AR at 596-99] Plaintiff continued to complain of

28  chronic low back pain, but Dr. McKinney notes that "we still don't have records from

1  her last [primary care physician] in [Arizona] (the medical records release form that

2  [plaintiff] filled were for the hospital)." [AR at 596]  Dr. McKinney commented that

3  plaintiff had already been told that "no narcotics would be dispensed without previous

4  records being available and reviewed." *Id.* Plaintiff presented as "anxious" and with

5  an "irritable affect." [AR at 597] More directly, Dr. McKinney specifically noted that

6  "plaintiff became [q]uite [u]pset when she was told (again) that she would not be

7  [receiving] narcotics as stated above. She was advised to sign a records release - this

8  time for her [primary care provider] in Arizona and she will be referred to Pain

9  Management for eval[uation] [and] treatment." *Id.*

10      On May 31, 2011, plaintiff again saw Dr. McKinney. [AR at 586-92] Plaintiff

11  was again upset when she did not receive Norco, as she represented she received it

12  from her previous medical care provider; however, Dr. McKinney noted that she

13  thoroughly read plaintiff's prior records from Arizona and there was no mention of any

14  narcotics being given to plaintiff anywhere. [AR at 586] Plaintiff calmed down after

15  Dr. Kinney communicated this, and was content to stay on Tramadol. *Id.* An MRI of

16  the spine revealed nerve root compression with central canal stenosis. *Id.* She was

17  referred to a pain management specialist to see what, if anything, could be done for the

18  pain. [AR at 585] A physical examination revealed mostly normal findings, with the

19  exception of posterior tenderness in the spine, paravertebral muscle spasms, and

20  bilateral thoracic and lumbosacral tenderness. [AR at 588] Dr. McKinney noted that

21  plaintiff has an "inappropriate affect," is "anxious, exhibits compulsive behavior, is

22  paranoid, has poor insight, [and] exhibits poor judgment." *Id.* Plaintiff was diagnosed

23  with chronic pain, spinal stenosis of lumbar region, alcoholic cirrhosis of the liver,

24  anxiety, and an unspecified alcohol dependence. [AR at 588-89] Dr. McKinney

25  prescribed Tramadol and Xanax, stated her intent to refer plaintiff to a neurosurgeon,

26  and advised plaintiff to keep her appointment with the Pain Clinic. *Id.*

27      On October 5, 2011, plaintiff presented to the emergency department for chronic

28  pain. [AR at 580-83] Dr. McKinney noted that plaintiff had been seeing providers

1   "outside of [Vista Community Clinic] [seeking] refills of narcotics according to her
2   CURES report. [Plaintiff was] told that she has broken her pain management contract
3   and will no longer be able to receive care at VCC due to this (after a month's grace
4   period for urgent care needs not including pain meds)." [AR at 581] A prescription for
5   Tramadol was refilled for her that day with no further instructions. *Id.*

6                    **8. William Weissman, M.D. (2011)**

7           On May 16, 2011, plaintiff presented at Vista Community Clinic as a repeat
8   patient with pain management issues. [AR at 593-95] She sought refills of pain
9   medications previously prescribed in Arizona, but was having difficult finding old
10  medical records. [AR at 593] Specifically, she stated that she had been given a prior
11  prescription for Norco, but was unable to provide records of the same. *Id.* A taking
12  of her vital signs and physical examination yielded normal findings, with moderate
13  pain associated with motion in the cervical spine and lumbar spine. [AR at 594] Dr.
14  Weissman refilled plaintiff's prescriptions for Tramadol, Soma, and Xanax, but
15  required more information from her if she sought a Norco prescription. *Id.* Although
16  typically seen by Dr. Cynthia McKinney, who also practices at the Vista Community
17  Clinic, plaintiff saw Dr. Weissman on this occasion. *Id.*

18          On September 12, 2011, Dr. Weissman completed an examination of plaintiff,
19  as well as a Physical Medical Source Statement. [AR at 545-48] Leading up to his
20  completion of the Medical Source Statement, Dr. Weissman indicated that plaintiff had
21  been visiting Dr. McKinney at the Vista Community Clinic monthly for the last nine
22  months, presenting with severe and constant neck and back pain, which lead him to
23  diagnose her with spinal stenosis, lumbar and cervical pain, muscle spasms, and
24  chronic pain. [AR at 545] As to how plaintiff's impairments might impact her ability
25  to work, Dr. Weissman asserted that plaintiff may become drowsy, dizzy, or experience
26  nausea as a result of her medications. *Id.* In addition, Dr. Weissman opined that
27  plaintiff's impairments have lasted or can be expected to last at least 12 months, and
28  that emotional factors contribute to the severity of her symptoms and functional

1  limitations. *Id.* Specifically, Dr. Weismann identified depression and anxiety as
2  contributing psychological conditions. [AR at 546]

3      Given all of these impairments, Dr. Weissman estimated plaintiff's functional
4  limitations if placed in a competitive work situation as follows: she could sit for no
5  more than 30 minutes before needing to get up; could stand for zero minutes before
6  needing to sit down or walk around; in an 8-hour workday, could sit and stand for less
7  than 2 or those 8 hours; could rarely lift and/or carry 10 pounds, and never lift or carry
8  anything more; could never twist, bend, crouch, squat, or climbs stairs or ladders; could
9  never use her arms, hands, or fingers to twist, finely manipulate, or reach overhead, but
10 could reach in front of her body 20% of the time during an 8-hour workday. [AR at
11 546-47] Given these limitations, Dr. Weissman stated that plaintiff needs a job that
12 permits her to shift positions at will from sitting, standing, and walking positions, and
13 that plaintiff must be permitted to walk every 90 minutes for at least 1 minute. [AR at
14 546] Dr. Weissman also opined that plaintiff will need to take numerous unscheduled
15 breaks during a normal workday, estimating at least 20 such breaks per day. *Id.*

16     Dr. Weissman estimated that 25% or more of plaintiff's average workday would
17 be spent "off task," meaning with symptoms severe enough to interfere with the
18 attention and concentration needed to perform even simple work. [AR at 548] Given
19 all of these issues, Dr. Weissman stated his belief that plaintiff is incapable of
20 tolerating even "low stress" work because she is in "constant severe pain" and her
21 impairments are likely to produce "all bad days" and no good days. *Id.*

22     **9. County of San Diego Mental Health Services (2011)**

23     On October 19, 2011, plaintiff was seen for an Initial Screening with the
24 following symptoms: depression, crying spells, anxiety, anhedonia, poor appetite,
25 trouble sleeping, and paranoia. [AR at 624-40] She was seen by Dr. Paula Proffitt.
26 Plaintiff denied any suicidal or homicidal tendencies, and denied any domestic violence
27 or current substance abuse. [AR at 626-27] Plaintiff's drug screening, however, was
28 positive for benzos, opiates, THC, and another stimulant. [AR at 632] Plaintiff later

1  admitted to occasional THC use and stated that she has some Xanax at home. *Id.*

2  Plaintiff disclosed three previous DUI convictions, spanning from 1983 to 1985. [AR

3  at 628] Based on the symptoms discussed and observed at the initial screening, and

4  because plaintiff already qualified for the County's Low Income Health Program

5  (LIHP), Dr. Proffitt found plaintiff met the medical necessity required for treatment,

6  prescribed Celexa, referred plaintiff to NCHC - Encinitas for continued care, provided

7  referrals for low cost counseling, and supplied crisis hotline numbers. [AR at 629-31]

8  ### III. ALJ HEARING AND DECISION

9  #### A. Plaintiff's Testimony

10  At the April 9, 2012 hearing before ALJ Spencer, plaintiff testified regarding her

11  work history, which included a combination of bar tending, convenience store

12  management, clerical, and customer service. [AR at 28-31] Based on plaintiff's

13  descriptions, almost all of her occupations, even the ones appearing more sedentary in

14  nature by job title, involved lifting, carrying, bending, and other physically strenuous

15  demands. *Id.* Plaintiff last worked in the summer of 2008, as a bartender at O'Leary's.

16  [AR at 31-32] She stopped working due to a broken right clavicle, suffered when she

17  was knocked down a flight of stairs in her home by three of her large dogs. [AR at 31-

18  33] Plaintiff stated she attempted to work after that injury, but was unable to function

19  because of "excruciating" and "horrible" pain in her right shoulder. [AR at 32] The

20  pain was especially impairing given that she is right handed. *Id.* As of the date of the

21  hearing, plaintiff stated that chronic pain, stiffness, and numbness in her lower back,

22  upper neck, legs, feet, arms, and hands render her unable to sit or stand for prolonged

23  periods of time and thus, unable to work. [AR at 33, 43] Plaintiff described the pain

24  as daily and usually the same, but sometimes spiking in intensity. [AR at 48] Plaintiff

25  stated that her pain is the worst in her lower back and neck. [AR at 48] Her lower back

26  pain pre-dated her clavicle injury, something she noticed when engaging in heavy

27  lifting (cases of beer, kegs, etc.) as a bartender. [AR at 34] When pressed on the issue,

28  however, plaintiff was unable to estimate, differentiate, or identify the timing,

1  sequence, or origin of each particular ailment. *Id.*

2      As of the date of the hearing, plaintiff reported to living in a house and asserted
3  that she did seek employment after November of 2008. [AR at 35] Specifically, she
4  applied online for customer service jobs and other similar jobs that did not involve
5  lifting. *Id.* She estimated that she last looked for work in December of 2011, but
6  qualified that she has not seen anything "out there" that would fit with her physical
7  limitations. [AR at 41-42] Given her limitations, plaintiff stated she needs a job that
8  will allow her to sit or stand at will, and estimated that she can lift no more than 10
9  pounds, can sit for no longer than 30 minutes at a time, and can stand on her feet for
10  no longer than 25 minutes at a time. [AR at 36]

11      She reported that she lives with a friend, and despite having a license, she has
12  not driven a vehicle for roughly two years, explaining that she gets "unfocused"
13  because the "pain's so bad." [AR at 37-38] Instead, she relies on friends and family
14  regularly, and public transportation occasionally. [AR at 38] On a typical day, plaintiff
15  gets out of bed, takes a shower, reads, and "piddle paddle[s] around the house," stating
16  "there's really not a whole lot I can do" and describing it as a "struggle." [AR at 39]
17  Plaintiff has no pets, is not active with any group or association, and cites walking
18  around the house and walking one block to the mailbox every other day as her only
19  regular exercise. [AR at 39-40] Plaintiff reports being able to shop, cook, and keep her
20  living space clean. [AR at 40]

21      Regarding plaintiff's history of alcohol abuse, she stated the last time she had
22  a drink was in late May 2010, but that she is not active in any sort of recovering
23  alcoholic support organization. [AR at 44-46] Plaintiff reported that she is limited in
24  the number and types of pain medications she can take, because of the severe reactions
25  she has had to them given her damaged liver. [AR at 47] Further, plaintiff indicated
26  that depression and anxiety are daily issues for her, specifically that she is "always
27  stressing out and thinking about just how [her] life has changed and how many things
28  [she] can't do - - - things [she] used to do." *Id.* As to her difficulty focusing, plaintiff

- 14 -                                    13cv1632-WQH(KSC)

1    reports that the intense pain causes her to lose her train of thought easily. [AR at 48]

2    Plaintiff testified that the last time she saw a doctor for pain management was

3    in 2011, since her liver is unable to process most of the pain medications they

4    prescribe. [AR at 49] Plaintiff also testified that she was "thrown out" of a program at

5    Vista Community Clinic (a federally funded clinic) because she had seen a doctor

6    outside of that clinic, but denied that charge and testified to following all clinic rules

7    and directions. [AR at 50]

8    **B.  The Written ALJ Decision**

9    On April 17, 2012, ALJ Spencer issued a written decision denying plaintiff's

10   claim for DBI and SSI, finding that plaintiff was not disabled within the meaning of the

11   SSA. [AR at 10-18]  First, he concluded that plaintiff had not engaged in substantial

12   gainful activity since the date of the alleged onset of disability, November 1, 2008. [AR

13   at 12] At step two, the ALJ found plaintiff suffered from the following "severe"

14   impairments, as defined in the Regulations: degenerative disc disease and stenosis of

15   the lumbar spine. [AR at 12, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)] Also at

16   step two, the ALJ found plaintiff suffered from cirrhosis of the liver due to alcohol

17   abuse, but found there was no evidence to suggest the disorder would result in more

18   than minimal limits and that it therefore did not qualify as a severe impairment. [AR

19   at 13]  At step three, however, plaintiff was found to have no impairment, or

20   combination thereof, that met or equaled an impairment listed under 20 C.F.R. §§

21   404.1520(d), 404.1525, 404.1526, 416.925, 404.920(d), 416.925, and 416.9296. [AR

22   at 13] Specifically, the ALJ found: "No physician has opined that the [plaintiff's]

23   condition meets or equals any listing, and the state agency program physicians opined

24   that it does not." *Id.*

25   In assessing plaintiff's residual functional capacity ("RFC") at step four, plaintiff

26   was deemed capable of lifting or carrying 10 pounds frequently and 20 pounds

27   occasionally; needed the opportunity to alternate between sitting and standing every

28   30 minutes; sit for no more than a total of 4 hours in an 8-hour workday; stand for no

more than a total of 4 hours in an 8-hour workday; occasionally bend, stoop, crawl, climb, kneel, and balance; and, avoid hazards. [AR at 13, 17]  Considering this RFC and the testimony from medical expert Eric Puestow, M.D. and vocational expert John Kilcher, the ALJ found plaintiff incapable of performing any of her past work as a bartender, clerk, truck rental agent, and assistant deli manager. [AR at 16] Notwithstanding her limitations, considering plaintiff's age, education, work experience, and RFC, the ALJ found at step five that jobs exist in significant numbers in the national economy that plaintiff is capable of performing, specifically as an assembler, packager, and garment sorter. [AR at 17] While the ALJ found that plaintiff's above-mentioned impairments could reasonably be expected to cause the alleged symptoms, he found plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms" not credible to the extent they are inconsistent with his RFC assessment. [AR at 20]

## IV.  LEGAL STANDARDS

### A.  Evaluating SSI and DBI Claims

To qualify for DBI or SSI benefits under the Social Security Act, an applicant must show that he or she is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least 12 months or cause death. 42 U.S.C. §§ 423(d), 1382.  The Social Security Regulations set out a five-step process for determining whether a person is disabled within the meaning of the SSA.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1194 (9th Cir. 2004).  If a party is found to be "disabled" or "not disabled" at any step in the sequence, there is no need to consider subsequent steps. 20 C.F.R. § 416.920.

First, the ALJ must determine whether the applicant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I). If not, then the ALJ must determine whether the applicant is suffering from a "severe" impairment within

1   the meaning of the Regulations. *Id.* If the impairment is severe, the ALJ must then
2   determine whether it meets or equals one of the "Listing of Impairments" in the
3   Regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the applicant's
4   impairment meets or equals a Listing, the ALJ must then determine whether the
5   applicant retains the residual functional capacity ("RFC") to perform his or her past
6   relevant work. *Id.* If the impairment does not meet or equal a Listing, the ALJ must
7   determine whether the applicant retains the residual functional capacity to perform his
8   or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the applicant cannot
9   perform past relevant work, the ALJ–at step five–must consider whether the applicant
10  can perform any other work that exists in the national economy. 20 C.F.R. §§
11  404.1520(a)(4)(v), 416.920(a)(4)(v).

12      While the applicant carries the burden of proving eligibility at steps one through
13  four, the burden at step five rests on the agency. *Celaya v. Halter*, 332 F.3d 1177, 1180
14  (9th Cir. 2003). Applicants not disqualified at step five are eligible for disability
15  benefits. *Id.*

16      **1. Substantial Evidence**

17      The SSA provides for judicial review of a final agency decision denying a claim
18  for DIB or SSI. 42 U.S.C. § 405(g). A reviewing court must affirm the denial of
19  benefits if the agency's decision is supported by substantial evidence and applies the
20  correct legal standards. *Id.*; *Batson*, 359 F.3d at 1193. Substantial evidence means
21  "such relevant evidence as a reasonable mind might accept as adequate to support a
22  conclusion." *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). When the
23  evidence is susceptible to more than one reasonable interpretation, an agency's
24  otherwise reasonable decision must be upheld. *Batson*, 359 F.3d at 1193. Where, as
25  here, the Appeals Council denies a request for review, the ALJ's decision becomes the
26  final agency decision that the court reviews. *Id.* at 1193 n.1.

27      **2. Allocating Weight to Medical Opinions**

28      When presented with conflicting medical opinions, the ALJ must determine

credibility and resolve the conflict. *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). Greater weight must be given to the opinion of treating physicians, and in the case of conflict, "the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician." *Id.* However, this does not mean the treating physician's opinion is dispositive. To the contrary, no physician's opinion is binding "with respect to the existence of a claimant's impairment or the ultimate determination of disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). Instead, an ALJ is to weigh the medical opinion evidence as a whole, considering the entire record. 20 C.F.R. § 404.1527. Further, an ALJ should not give controlling weight to a treating physician's opinion of limitations unless it is "well-supported" and "not inconsistent" with other substantial evidence in the record. *Id.* at (d)(2).

### 3. Credibility of Claimant

In deciding whether to credit a party's testimony about subjective symptoms or limitations, the ALJ must engage in a two-step analysis. *Batson*, 359 F.3d at 1196; *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). First, the party must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce pain or other symptoms. *Batson*, 359 F.3d at 1195; *Smolen*, 80 F.3d at 1281. If this test is satisfied, and there is no affirmative defense that the party is malingering, then the ALJ must determine the credibility of the party's subjective complaints. *See Robbins v. Social Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006). In assessing the credibility of a party's subjective complaints, the ALJ may consider such factors as the party's reputation for truthfulness, daily activities, and any inconsistencies in the statements. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997); *Smolen*, 80 F.3d at 1284. While the ALJ must not disregard a party's testimony about the severity of pain solely due to a lack of substantiation by objective medical evidence, Congress expressly prohibits granting disability benefits based solely on a party's subjective complaints. *See Robbins*, 466 F.3d at 883; 42 U.S.C. § 423(d)(5)(A)("An individual's statement as to pain or other symptoms shall not alone

1  be conclusive evidence of disability."). An ALJ's credibility finding must be properly
2  supported by the record and sufficiently specific to ensure a reviewing court that he or
3  she did not "arbitrarily discredit" a party's subjective testimony. *Thomas v. Barnhart*,
4  278 F.3d 947, 958 (9th Cir. 2002).

5  ## V.  DISCUSSION

6  The ALJ's analysis at steps 1 through 4 is not in dispute. The ALJ provided
7  specific and legitimate reasons for the weight apportioned to the testimony, opinions,
8  and medical records presented during and in advance of the hearing. Additionally, the
9  ALJ's discussion of the entire record, including reasons plaintiff states in support of
10  her position, reflects that the ALJ did consider the record as a whole. *See Gallant v.*
11  *Heckler*, 753 F.2d 1450, 1455-56 (9th Cir. 1984) (in determining existence of
12  substantial evidence a reviewing court must consider both evidence that supports and
13  detracts from ALJ's conclusion). The ALJ methodically evaluated plaintiff's
14  testimony, the opinions of the treating physicians, the testimony and opinions of
15  medical and vocational experts, and plaintiff's entire medical record in arriving at his
16  conclusion regarding plaintiff's RFC. To the extent that the RFC articulated by the
17  ALJ conflicts with the opinions of Dr. Weissman or plaintiff's subjective complaints,
18  the ALJ provided clear and convincing reasons for rejecting both the subjective claims
19  and the opinions. Thus, the ALJ's findings at steps 1 through 4 are supported by
20  substantial evidence and are free of legal error.

21  Plaintiff does not challenge the RFC or the ALJ's evaluation of the medical
22  evidence or her credibility. Rather, she only challenges the ALJ's reliance on the
23  vocational expert's testimony in finding that plaintiff was still capable of performing
24  a significant number of jobs in the national economy. Specifically, plaintiff contends
25  that the ALJ erred by (1) failing to include all of plaintiff's limitations in his
26  hypothetical to the vocational expert; (2) failing to apply a sedentary base grid to
27  plaintiff given the significant erosion to the light vocational base; and, (3) relying on
28  testimony that is inconsistent with other jobs data noticed by defendant. For the

1  reasons outlined in greater detail below, none of the alleged deficiencies warrant
2  reversal of the ALJ's written decision and findings.

3  ### A. The Hypothetical Posed to the Vocational Expert

4      Plaintiff argues that the ALJ erred in relying on the testimony of vocational
5  expert John Kilcher because of a discrepancy between plaintiff's limitations as posed
6  in a hypothetical scenario by the ALJ to Mr. Kilcher during the hearing, and the actual
7  limitations ultimately recognized and established by the ALJ in his written decision.
8  [Doc. No. 16-1, p. 10] Specifically, whereas the ALJ ultimately found that plaintiff
9  could, *inter alia*, "sit for no more than a total of 4 hours in an 8-hour workday," the
10 hypothetical scenario presented to and assumed by Mr. Kilcher during the hearing was
11 one where plaintiff could, *inter alia*, sit for *more than 4* hours per workday. The
12 discrepancy regarding plaintiff's ability to stay in a seated position is the only
13 difference between the limitations recognized in the ALJ's written decision and the
14 hypothetical presented to the vocational expert at the hearing. Plaintiff contends that
15 this was an incorrect hypothetical scenario, that Mr. Kilcher developed a vocational
16 opinion regarding the availability of jobs fitting plaintiff's limitations based off this
17 incorrect assumption, and that the ALJ relied on this vocational opinion in arriving at
18 his ultimate conclusion. Based on this Court's reading of the administrative record, the
19 hearing at issue, the ALJ's written decision, and the relevant occupations identified by
20 Mr. Kilcher, there is no evidence to suggest that this inconsistency impacted the ALJ's
21 ultimate determination, let alone prejudiced plaintiff in any way.

22     The ALJ's hypothetical contained an incorrect clause stating plaintiff was
23 capable of sitting for more than 4 hours in a workday. The hypothetical also contained
24 a clause permitting plaintiff to alternate between sitting and standing as regularly as
25 every 30 minutes throughout an 8-hour workday (as is assumed and established in the
26 written decision as well). The inconsistent sit scenario posed in the hypothetical does
27 not impact the analysis for the following two reasons. First, because plaintiff would
28 be permitted to alternate between sitting and standing every 30 minutes, she would

1  never be required, as a practical matter, to sit for more than four hours in an 8-hour
2  workday.  Second, taking the more-than-4-hour sit scenario at face value, the issue is
3  moot because none of the three specific occupations identified by vocational expert
4  Kilcher require plaintiff to sit for more than 4 hours (even though the ALJ's
5  hypothetical question assumed that she could).

6      While the sit clause at issue in the hypothetical was, on its own, technically
7  inconsistent with the limitations established in the written decision, the plain language
8  of the at-will clause allowing plaintiff to alternate between sitting and standing as
9  regularly as every 30 minutes cures any deficiency.  Further, the transcript from the
10 administrative hearing demonstrates that the vocational expert was acutely aware of
11 this 30 minute sit/stand requirement in recommending the three occupations presented
12 to the ALJ.  It is apparent to this Court that the vocational expert did not contemplate
13 plaintiff being forced to sit for more than 4 hours in a workday, and clearly accounted
14 for the 30 minute sit/stand clause in arriving at his opinions and selecting the three
15 occupations as being suitable for plaintiff's needs and limitations.  [AR at 62-63, 68-
16 69] Therefore, this Court is satisfied that the 30 minute sit/stand option, which on its
17 face conflicts with the more-than-4-hour sit scenario, neutralized and rendered moot
18 any facial inconsistency.  Because the 30 minute option appears in both scenarios, the
19 RFC presented in the hypothetical and the RFC outlined in the final written decision,
20 as a practical matter, function as the same.

21     In *Embrey v. Bowen*, the Ninth Circuit held that when a vocational expert
22 provides testimony based off a hypothetical scenario, the hypothetical posed must set
23 out all of a claimant's limitations and restrictions for the expert's testimony to be
24 deemed reliable.  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).  Applying
25 *Embrey* to the instant action, the alleged error in the hypothetical ALJ Spencer posed
26 to vocational expert Kilcher appears harmless.  Even though the hypothetical sit
27 limitation presented to the vocational expert was, on its own, technically incorrect,
28 there is no apparent prejudice to plaintiff as a result, given that the error was sanitized

1   by the plaintiff's consistently-recognized need to alternate between sitting and standing

2   (every 30 minutes if necessary) throughout a typical workday.  If plaintiff were

3   permitted to alternate between sitting and standing every 30 minutes, a controlling

4   clause in both the hypothetical and the written decision, an 8-hour workday for plaintiff

5   would not entail more than 4 hours of sitting.

6       For all of these reasons, the issues raised by plaintiff regarding the hypothetical

7   scenario posed to the vocational expert do not want warrant reversal or remand of

8   defendant's final decision.  Defendant sufficiently carried its burden at step 5 of the

9   analysis.  If there was any error at all, it was harmless and not the type contemplated

10   in *Embrey*, wherein a hypothetical question posed to a vocational expert contained

11   incomplete information (i.e. entirely without reference to certain of the plaintiff's other

12   medically determinable and recognized limitations).  This is not the case in this action.

13       **B. The ALJ's Application of the Grids**

14       Plaintiff alleges that the ALJ erred in his application of the medical vocational

15   guidelines (the "Grids").  "The Grids are used to determine whether substantial gainful

16   work exists for the claimant with respect to substantially uniform levels of

17   impairment."  *Thomas v. Barnhart*, 278 F.3d 947, 960 (9th Cir. 2002).  Plaintiff

18   contends that the ALJ's use of the light job base, as opposed to the sedentary job base,

19   was an error. [Doc. No. 16-1, pp. 13-14]  Plaintiff argues that the vocational expert

20   "testified three times that the sedentary job base would be the most appropriate

21   exertional base[] due to the limited standing and the sit/stand 30 minute option," and

22   that both counsel and the ALJ at the hearing "recognized that the full range of light

23   work was significantly reduced [and] that the application of the sedentary grid rule was

24   an issue critical to the analysis." *Id*. at 13.  Plaintiff takes specific issue with the ALJ's

25   lack of inquiry into the "degree of erosion" to the entire light job base, as well as to the

26   three specific jobs identified by Mr. Kilcher. *Id*. at 14.  Plaintiff argues that applying

27   a reduced light occupational base (with erosion from the full-range of the light work

28   base reflecting plaintiff's additional limitations) instead of a sedentary base is

        13cv1632-WQH(KSC)

1  especially significant because plaintiff would have been found disabled under the SSA
2  had a sedentary base been applied. *Id.*

3      Defendant contends that the ALJ properly considered plaintiff's additional
4  limitations in eroding the occupational base for light work available to plaintiff, and
5  that the ALJ reasonably relied upon the testimony of the vocational expert in finding
6  that, even after a reduction, there were a significant number of remaining light jobs
7  plaintiff could perform. [Doc. No. 23-1, pp. 5-6] When, as here, an individual's
8  exertional limitations fall between the Grids because the Grids do not adequately take
9  into account a claimant's full range of abilities and limitations, the occupational base
10  is impacted, and this impact may or may not represent a significant number of jobs in
11  terms of the rules directing a conclusion regarding disability. *Thomas v. Barnhart*, 278
12  F.3d at 960; *see* Social Security Ruling ("SSR") 83-12, *available at* 1983 WL 31253.
13  "Where the extent of erosion of the occupational base is not clear, the adjudicator will
14  need to consult a vocational resource." SSR 83-12, 1983 WL 31253 at *2. SSR 83-12
15  contemplates the exact type of scenario faced by plaintiff, specifically addressing a
16  claimant needing to alternate at will between sitting and standing. "Unskilled types of
17  jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In
18  cases of unusual limitation of ability to sit or stand, a [vocational specialist] should be
19  consulted to clarify the implications for the occupational base." *Id.* at *4.

20      ALJ Spencer therefore did exactly what the Regulations, caselaw, and SSR 83-
21  12 directed him to do—he consulted a vocational expert. The expert testified that a
22  person with plaintiff's profile could perform substantial gainful work in the economy,
23  identifying three light level occupations plaintiff could perform, the numbers of which
24  were reduced to account for the sit/stand option. [AR at 62-64, 69] Even after
25  reduction, and based on the vocational expert's testimony, the ALJ found that a
26  significant number of jobs were available in the three occupations identified. Based
27  on this analysis, the ALJ found that plaintiff was not disabled. "SSR 83-12 does not
28  mandate a finding of 'disabled.' Instead, it mandates the use of a [vocational expert],

1  which was exactly the process used in this instance." *Moore v. Apfel*, 216 F.3d 864,
2  871 (9th Cir. 2000).

3      Plaintiff asserts that the vocational expert opined that a sedentary job base would
4  be the most appropriate exertional base due to plaintiff's need for a 30 minute sit/stand
5  option.   Thus, plaintiff argues that the ALJ committed error in not following this
6  alleged recommendation, or in not giving clear reasons for rejecting it.   Plaintiff's
7  argument fails, mis-characterizes the nature of vocational expert Kilcher's testimony,
8  and misconstrues the role of the vocational expert.   Mr. Kilcher qualified that
9  application of the sedentary base was his "interpretation" of the Grids alone, since
10 plaintiff's condition fell between the light and sedentary base options. [AR at 69-70]
11 Vocational expert Kilcher further explained that the Grids provide no further clarity
12 beyond the base levels, and if forced to choose between a *full range* of light base and
13 the sedentary options, he would round down to sedentary because plaintiff's limitations
14 simply would not fit into the full range of light base as outlined in the Grids.   *Id.*

15      Given that vocational experts are routinely called to assist ALJs in instances
16 where a claimant's abilities fall between the Grids, Mr. Kilcher's statements are not at
17 all surprising. Thus, plaintiff's "all of nothing" argument is simply not practical, is
18 clearly not what was contemplated or intended under the Regulations, and does not
19 even appear to be what Mr. Kilcher anticipated.   Mr. Kilcher did not testify that the
20 light base had been so eroded by plaintiff's limitations that the jobs left available were
21 insignificant in number.   Taking plaintiff's logic to its natural conclusion, the process
22 of "eroding" a base grid would never occur, as all potential erosion scenarios would be,
23 as a matter of course, rounded down to the next base option.   This approach would
24 obviate the need to consult a vocational expert to assess and account for a claimant's
25 abilities and limitations which otherwise fall outside of or between Grids. The caselaw,
26 Regulations, and SSRs, however, allow and sometimes mandate that ALJs consult with
27 vocational experts for very the purpose of analyzing erosion scenarios and identifying
28 the type and number of occupations in existence tailored to a claimant's specific

1    abilities/limitations.

2    Furthermore, even assuming it was Mr. Kilcher's "recommendation" that the
3    sedentary base be applied, despite the vocational expert's role as testifying expert, the
4    ALJ, not the vocational expert, is responsible for weighing the value of all the evidence
5    presented (including the expert testimony), determining the degree of erosion, and
6    ultimately selecting the appropriate Grid Rule. While a vocational expert must be
7    consulted as part of this process, it does not naturally follow that every
8    recommendation made or interpretation advanced by the vocational expert must be
9    adopted by the ALJ. *Thomas v. Barnhart*, 278 F.3d at 960 ("...when a claimant's
10   exertion limitation falls between two grid rules, the ALJ fulfills his obligation to
11   determine the claimant's occupational base by consulting a vocational expert regarding
12   whether a person with claimant's profile could perform substantial gainful work in the
13   economy.").

14   For all of these reasons, this Court finds that defendant sufficiently carried its
15   burden at step 5 of the analysis and that the ALJ did not err in his application of the
16   Grids. The ALJ was required to consult with a vocational expert. The expert testified
17   that plaintiff was capable of performing substantial gainful work in the economy,
18   identifying three light level occupations plaintiff could perform, and providing
19   corresponding reduced numbers the ALJ found to be significant. Based on this
20   analysis, the ALJ found that plaintiff was not disabled. The ALJ's actions were proper,
21   and his findings are substantially supported by the administrative record. Even if Mr.
22   Kilcher disagreed with the ALJ's refusal to select the sedentary grid option, as argued
23   by plaintiff, this does not undercut or otherwise devalue Mr. Kilcher's other findings,
24   namely that three light jobs exist that plaintiff can perform given all of her limitations,
25   including the sit/stand option. Accordingly, the ALJ's application of the Grids does
26   not warrant reversal or remand of defendant's decision denying plaintiff disability
27   benefits.

28   / / /

## C.  The Jobs Numbers Presented by the Vocational Expert

Plaintiff contends that the ALJ committed further error by relying on the vocational expert's testimony in arriving at the numbers of jobs nationally and regionally available for the three occupations identified as being suitable for plaintiff. Specifically, plaintiff argues that the numbers[2] presented are not supported by the other evidence adduced at the hearing, or with other sources of reliable jobs data administratively noticed and relied upon by defendant.  [Doc. No. 16-1, pp. 14-21] Plaintiff asserts that the ALJ improperly considered only national numbers, and attacks the accuracy of the numbers elicited from vocational expert Kilcher, citing allegedly conflicting data from the County Business Patterns, a source published by the Bureau of Census.  *Id.* at 15.  Specifically, plaintiff claims the vocational expert made an aggregation error. *Id.* at 19.

Defendant argues that plaintiff's challenge of the data is untimely, and that the ALJ properly relied on the vocational expert's testimony in both accepting the numbers and in finding the numbers to be "significant."  Defendant contends that plaintiff's counsel raised no objection at the hearing regarding the vocational expert's expertise and qualifications, that plaintiff failed to challenge the numbers or submit any alternative evidence from other vocational sources during or after the hearing, and failed to raise the issue with the Appeals Council on review. [Doc. No. 23-1, 7] For the first time before this Court, plaintiff now challenges the numbers provided by the vocational expert and adopted by the ALJ because they allegedly conflict with or are undercut by other sources of vocational data.  Defendant asserts that this type of argument was addressed in *Gutierrez v. Commissioner of Social Security*, 740 F.3d

---

[2] From the ALJ's written opinion: "The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as: assembler, with 400 local jobs and 120,000 national jobs; packager, with 200 local jobs and 100,000 national jobs; and garment sorter, with 250 local jobs and 125,000 national jobs.  All of the numbers of these jobs reflect a reduction to the claimant's occupational base for unskilled light work due to the nonexertional limits identified in the residual functional capacity." [AR at 17 (emphasis omitted)]

1  519, 527 (9th Cir. 2014), when the Ninth Circuit rejected a plaintiff's after-the-fact
2  challenge to the jobs numbers, noting that the claimant failed to challenge the
3  vocational expert's expertise and testimony regarding the numbers during the hearing.
4  [Doc. No. 23-1, p. 7]

5      Plaintiff's arguments are without merit.  When the Grids do not match a
6  claimant's qualifications, an ALJ can rely on vocational expert testimony to determine
7  whether a claimant can still perform jobs in the national economy.  *Thomas v.*
8  *Barnhart*, 278 F.3d at 960; *see* SSR 83-12, *available at* 1983 WL 31253.  "An ALJ
9  may take administrative notice of any reliable job information, including information
10 provided by a [vocational expert].  A [vocational expert's] recognized expertise
11 provides the necessary foundation for his or her testimony." *Bayliss v. Barnhart*, 427
12 F.3d 1211, 1218 (9th Cir. 2005) (citation omitted).  At the time of the hearing and on
13 appeal, plaintiff failed to challenge the credibility of the expert or the numbers
14 provided, despite having cross-examined Mr. Kilcher during the hearing. [AR at 35,
15 63-70] Plaintiff fails to identify any actual error in the ALJ's reliance on the vocational
16 expert's testimony.  Rather, plaintiff offers in its Motion for Summary Judgment
17 alternative vocational data evidence.  As stated by defendant: "Plaintiff's attorney is
18 not a vocational expert; she is merely piecing together statistics from various sources
19 and offering her own layperson's interpretation." [Doc. No. 23-2, p. 7]

20     In this case, the ALJ took administrative notice of reliable jobs information,
21 namely testimony from vocational expert John Kilcher.[3]  This reliance was proper.
22 *Bayliss*, 427 F.3d at 1218.  In response to a hypothetical from the ALJ describing
23 plaintiff's limitations, the vocational expert identified three occupations an individual
24 with such limitations could perform.  He based that determination on his own expertise,

25

26   [3] During the hearing, Mr. Kilcher relied on the Dictionary of Occupational Titles
27 ("DOT"), a source published by the Department of Labor, in testifying to the three
   occupations at issue. [AR at 63-64]  The DOT, the County Business Patterns, and 3
28 other publications are recognized and listed in the Regulations as being sources of
   reliable job data and information.  *See* SSR 00-4p; 20 C.F.R. §§ 404.1566(d);
   416.966(d).

- 27 -                                           13cv1632-WQH(KSC)

1 as well as on the position descriptions in the Dictionary of Occupational Titles
2 ("DOT").[4] Because the DOT provides only job descriptions and specifications, and not
3 the actual hard numbers regarding the national and regional availability of the same,
4 vocational experts utilize additional secondary sources to ascertain the numbers of
5 positions that exist for each of the DOT codes identified. *Brault v. Social Security*
6 *Admin.*, 683 F.3d 443, 446 (2nd Cir. 2012). These secondary sources typically
7 correlate directly with the DOT codes. *Id.* In this case, vocational expert Kilcher does
8 not specifically identify, during the hearing or anywhere in the overall record, which
9 secondary source he used to provide the ALJ with the actual reduced numbers plaintiff
10 is now challenging.

11     To dispute the numbers, plaintiff relies on a non-binding case from the Second
12 Circuit, *Brault v. Social Security Administration*, *supra*, to argue that a vocational
13 expert's testimony can be adversely impacted by the concept of data aggregation –"a
14 many-to-one mapping, such as the one the [vocational expert] used to associate DOT
15 titles to [a different system of codes used by a secondary source], necessarily creat[ing]
16 information loss." *Id.* In *Brault*, a vocational expert relied upon a secondary source
17 for jobs numbers which identified jobs using a different coding system than the DOT.
18 The *Brault* plaintiff argued that the numbers ultimately arrived at by the vocational
19 expert were impacted in translation by data aggregation or "inexact matching." *Id.* at
20 445. The Second Circuit recognized the theory as being potentially viable and possibly

21

22     [4] "The DOT gives a job type a specific code–for example, '295.467-026
23 Automobile Rental Clerk'–and establishes, among other things, the minimum skill
level and physical exertion capacity required to perform that job. Because of the
24 detailed information appended to each DOT code, the codes are useful in determining
the type of work a disability applicant can perform. In fact, the DOT is so valued that
25 a [vocational expert] whose evidence conflicts with the DOT must provide a
'reasonable explanation' to the ALJ for the conflict. The DOT, however, just *defines*
26 jobs. It does not report how many such jobs are available in the economy." *Brault v.*
*Social Security Admin.*, 683 F.3d 443, 446 (2nd Cir. 2012) (emphasis in original).
27 Because the DOT does not provide the actual numbers, vocational experts often turn
to additional secondary sources for this information, one such acceptable source being
28 the Occupational Employment Quarterly III (the "OEQ"), which is prepared by a
private organization called U.S. Publishing, "to assess whether positions exist for each
of the [] DOT codes identified." *Id.*

1   having a real and significant impact on numbers produced by vocational experts. The
2   Second Circuit reasoned, however, that the vocational expert's reliance on this
3   secondary source did not rise to the level of reversible error because the ALJ sought
4   and received a stipulation regarding the expert's qualifications, plaintiff's counsel
5   challenged the numbers and raised the issue of data aggregation on its cross-
6   examination of the expert at the hearing, and counsel was even permitted to submit
7   supplemental briefing to the ALJ on the same issue after the hearing. "In sum,
8   [claimant's] attorney had a full opportunity to explain his objections in significant
9   detail. Nothing more was required." *Id.* at 451.

10          The crux of plaintiff's argument in the present action is that because the DOT
11  codes do not always directly correlate with job coding systems utilized by other
12  secondary job data sources, data can be lost in translation, leading to unreasonably
13  inflated or deflated job numbers. Plaintiff, however, makes this argument without
14  knowing which secondary source was utilized by vocational expert Kilcher. If plaintiff
15  took issue with Mr. Kilcher's qualifications or the source of his jobs data, the time to
16  raise that issue was during the hearing, shortly thereafter, or on appeal. Based on this
17  Court's review of the administrative record, the Regulations, and the case law, the ALJ
18  properly assessed plaintiff's limitations, determined that these limitations impacted her
19  ability to perform the full range of light work as defined in the Grids, and obtained
20  vocational expert testimony to identify a significant number of reduced light-level jobs
21  she was still capable of performing with her specific limitations.

22          Nothing in the administrative record undercuts the ALJ's reliance on the
23  vocational expert's testimony, and as argued by defendant, "there is no requirement
24  that the Commissioner consult every vocational data source listed under sections
25  404.1566 and 416.966, compare them, and then determine whether there is available
26  alternative work in the national economy for a claimant." [Doc. No. 23-1] While the
27  record fails to reflect the exact secondary source the vocational expert utilized in
28  providing the ALJ with the reduced jobs numbers, there is no requirement that the ALJ

1 make such an inquiry, as he was well within his discretion to rely on the expertise and
2 testimony of the expert. *Bayliss*, 427 F.3d at 1218. Further, it is relevant that
3 plaintiff's counsel failed to challenge the vocational expert's expertise or testimony
4 regarding these numbers, or otherwise further explore the veracity of these figures,
5 during the hearing before the ALJ. *See Gutierrez*, 740 F.3d at 527.

6 Accordingly, this Court finds that defendant sufficiently carried its burden at step
7 5 of the analysis. No error or unsupported finding in the administrative record or
8 written decision has been identified or discovered. Rather, plaintiff seeks to
9 collaterally attack the ALJ's findings with extraneous vocational data, advancing lay
10 theories interpreting the same. This data was available to plaintiff at the time of the
11 hearing, and on direct review to the Appeals Council. The ALJ's reliance on the
12 testimony of vocational expert Kilcher regarding the type and number of jobs in
13 existence plaintiff is capable of performing was proper. Nothing presented by plaintiff
14 in her moving papers [Doc. Nos. 16, 26] warrants reversal or remand of defendant's
15 decision denying plaintiff disability benefits.

16 ## VI. CONCLUSION

17 Consistent with the foregoing, the Court **RECOMMENDS** that plaintiff's
18 Motion for Summary Judgment [Doc. No. 16] be **DENIED**, and that defendant's Cross
19 Motion for Summary Judgment [Doc. No. 23] be **GRANTED**.

20 This Report and Recommendation ("R&R") is submitted to the United States
21 District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1). Any party may
22 file written objections with the Court and serve a copy on all parties **within 14 days**
23 **of being served with a copy of this R&R.** The document should be captioned
24 "Objections to Report and Recommendation." Failure to file objections within the
25 specified time may affect the scope of review on appeal. *Baxter v. Sullivan*, 923 F.2d
26 1391, 1394 (9th Cir. 1991).

27 Date: June ___ 26 ___, 2014

28

KAREN S. CRAWFORD
United States Magistrate Judge